STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Douglas H. CLAPPES, Defendant-Respondent.

Supreme Court

*No. 82–565–CR. Argued January 5, 1984.—*
*Decided February 28, 1984.*

(Also reported in 344 N.W.2d 141.)

For the plaintiff-appellant-petitioner the cause was argued by *David J. Becker,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the defendant-respondent there was a brief by *Mary Lou Robinson* and *Robinson, Smith & Robinson,* Appleton, and oral argument by *Nila Robinson.*

STEINMETZ, J. The issue in this case is whether statements made by the defendant in response to questions asked by a police officer are inadmissible because

the questions were not preceded by *Miranda* warnings.[1] The defendant made the statements after he had been brought from the scene of an automobile accident to a hospital and was on an emergency room table.

Both the trial court, the Honorable Frederick W. Fleishauer, circuit court judge for Portage county assigned to the Waupaca county circuit court, and the court of appeals concluded that the defendant was subjected to custodial interrogation, and, therefore, any statements he made without being apprised of his *Miranda* rights were subject to suppression.

The defendant is charged with one count of operating a motor vehicle after revocation, sec. 343.44(1), Stats., and two counts of homicide by intoxicated use of a motor vehicle in violation of sec. 940.09.

The facts which are undisputed are that there was a single-car accident which occurred at about 11:30 p.m. on May 20, 1980, on a county trunk highway, north of the City of Waupaca, Wisconsin. Two people were pronounced dead at the scene of the accident. The defendant was taken to an emergency room at Riverside Hospital in Waupaca where he was treated for lacerations, a ruptured bladder, a dislocated elbow, a compound fracture of the left femur, and shock.

Officer Gerald Jorgenson and Sgt. Donald Morey of the Waupaca County Highway Patrol had been to the scene of the accident to investigate and then had gone to the hospital. They testified their purpose in going to Riverside Hospital was to identify the dead and to obtain other information which they needed in order to complete their reports. Officer Jorgenson testified: "[M]yself and Sgt. Morey left the scene to go to Riverside Hospital to try to get some positive identification on the two individuals that were transported at that time." Sgt. Morey testified: "[M]yself and Officer Jorgenson

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

went to Riverside Hospital to complete our reports and obtain the identification of one of the people in the accident," and "I was trying to find the relative, the positions, the firm positions all of the people in the vehicle and find who the driver was for the accident report."

By the time they arrived at the hospital, the officers knew that the accident car was owned by the defendant and that he did not have a driver's license. This, along with the physical circumstances of bodies at the accident scene, made them suspect that the defendant was the driver.

Once at the hospital, the officers attempted to identify the two deceased persons. Initially, they were successful only in identifying one of the victims and therefore, among other questions, they wished to ask the defendant about the identity of the other victim. They entered the emergency room where the defendant was being treated and Sgt. Morey began the questioning.

The questioning, which was not preceded by *Miranda* warnings, occurred at a time when the defendant was being treated by at least two doctors, two aides, two lab technicians, and a nurse. Sgt. Morey testified in respect to whether he asked a doctor if he could question the defendant as follows: "As I recall, I did ask 'Is it all right if I talk to him?' when I wanted to find out the identity of the girl." (One of the deceased victims.)

The officer who questioned the defendant stood at the head of the examining table and used a louder than normal voice which he likened to the same level of his voice used while he was testifying in court. In the course of the questioning, which lasted only two to three minutes, the defendant identified the two deceased victims and their positions in the car before the accident, and acknowledged he had been the driver of the car. Officer Jorgenson stood at the other side of the head of the table

during the time Sgt. Morey asked the defendant the questions. He summarized the questioning as follows:

"Officer Morey was in a very loud voice asking the defendant, Mr. Clappes, if he could hear him, and he stated he could; and he had asked who the girl was, and his reply was Stacy, and he said, . . . 'Where does Stacy live?' and he said, 'On the back road to King;' and he asked if, where Stacy was sitting, and he said the front passenger side. He asked where Mike was sitting. He said in the back seat; and then he said, made it a statement more or less, 'And you were driving; is that right?' and he repeated that, as I recall, once again, 'And you were driving; is that right?' and he said 'Yes.' "

Immediately following this questioning, the defendant was arrested and was issued a citation charging him with operating a motor vehicle while under the influence of an intoxicant. Pursuant to Officer Jorgenson's direction, a nurse, after conferring with one of the doctors, drew a sample of blood, which later was analyzed and indicated a blood alcohol level of .162.

The testimony of the officers was received at a preliminary examination. Subsequently, the defendant brought a motion to suppress his statements and admission of driving. The trial court granted the motion finding this case to be controlled by *Scales v. State,* 64 Wis. 2d 485, 219 N.W.2d 286 (1974).

The state filed a notice of appeal. The court of appeals, in an unpublished opinion, concluded that the defendant was subjected to "custodial interrogation" applying the *Scales* decision, and, therefore, *Miranda* warnings were required.

There are no disputed facts and therefore this court will review the trial court and court of appeals legal conclusion *ab initio* since only a question of law is presented as to whether the defendant was in custody. As we said in *State v. Felton,* 110 Wis. 2d 485, 504, 329 N.W.2d 161 (1983): "In this case, . . . the facts and the inferences

to be drawn therefrom are undisputed. This court is not bound by a determination of the trial court which is based on undisputed facts, for, under those circumstances, only a question of law is presented." Earlier in *Compton v. Shopko Stores, Inc.,* 93 Wis. 2d 613, 616, 287 N.W.2d 720 (1980): "[T]his court has repeatedly held that on review this court is not bound by a finding of the trial court which is based upon undisputed evidence when that finding is essentially a conclusion of law." Since the facts are undisputed, the legal significance of those circumstances will be independently determined by this court. The conclusion arrived at by the trial court and the court of appeals was that in applying *Scales,* the defendant was, due to his physical condition, deprived of his freedom of action in a significant way, which was virtually the same as being in custody.

In the forerunner case to *Miranda, Escobedo v. Illinois,* 378 U.S. 478, 490–91 (1964), the court held:

"[T]hat where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligator upon the States by the Fourteenth Amendment,' *Gideon v. Wainwright,* 372 U.S., at 342, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

*Miranda* was not based on the sixth amendment as was *Escobedo,* but rather on the fifth amendment's privilege against self-incrimination. The issue resolved in *Miranda,* as stated by that court was: "the admissibility of

statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 445. The court decided that statements of the defendant obtained from questions asked while in *custody or otherwise deprived of his freedom of action in any significant way* could not be used as evidence against him, unless preceded by the *Miranda* warnings.

The Supreme Court in *Miranda* dealt in main with the restricted and coercive atmosphere when the defendant is accompanied only by the police and is in isolation from others and the world in general and the psychological pressures thus placed on the defendant. *Id.* at 448–49. The Court considered and reported with disapproval police interrogation techniques and summarized them as follows:

"From these representative samples of interrogation techniques, the setting prescribed by the manuals and observed in practice becomes clear. In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must 'patiently maneuver himself or his quarry into a position from which the desired objective may be attained.' When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights.

"Even without employing brutality, the 'third degree' or the specific stratagems described above, the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Id.* at 455.

The Court made it clear that it was dealing with a type of interrogation environment created by the police in which the authorities could take advantage of the situation. The Court said:

"It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.* at 457–58.

The Court specifically stated it was an atmosphere created by the authorities for questioning that caused the necessity for the warnings. The Court held:

"We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." *Id.* at 461.

The *Miranda* Court spoke again of the psychological pressures when the defendant is subject to "the unsupervised pleasure of the police" while citing *Mapp v. Ohio,* 367 U.S. 643, 685 (1961). *Id.* at 466.

Insight that *Miranda* only applies to circumstances of custodial curtailment of freedom created by the police is gained from the Court's statement:

"Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." *Id.* at 475.

The Court in *Miranda* dealt with principles of protection of the "privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way." *Id.* at 477. While stating the protections, the court also stressed: "Our decision is not intended to hamper the traditional function of police officers in investigating crime." *Id.* at 477.

The Court focused in on its meaning that it was custody or other deprivation of defendant's freedom that required the warnings be given when it stated: "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom *by the authorities* in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Id.* at 478. (Emphasis added.)

In *Scales,* the defendant was under arrest and was therefore in custody. This court held: "Scales was under arrest. To say that he was not in custody, either because he was not conscious and did not realize he was arrested or because he was not explicitly told that he was in custody, is sophistry." 64 Wis. 2d at 492.[2] We agree

---

[2] However, at that same place *Scales* stated "[a]ccusatorial attention had focused upon Scales" and that was a coercive factor of *Miranda*. In *Miranda* the Court abandoned the accusatorial attention element for requiring the warnings and zeroed in on custody or deprivation of freedom of action as the test for the warnings.

In *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977), the Court held:

"[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement

with the holding in *Scales* but that case is distinguishable from the present case. In the instant case the defendant was not under arrest.

In *Scales* we stated that *Miranda* warnings had to be given since the injured defendant while in the hospital "was as effectively bound to his bed as if he had been shackled to it." *Id.* at 492. However, it is restraint as created by the authorities that provides the *Miranda* coercive atmosphere according to *Miranda*. There is no need to go beyond the *Miranda* holding to secure equal application of constitutional rights, which was the basic purpose of *Miranda*. The *Scales* decision did not stress the entire language of the United States Supreme Court stating "when an individual is taken into custody or otherwise deprived of his freedom *by the authorities* in any significant way and is subjected to questioning." *Miranda,* 384 U.S. at 478. (Emphasis added.) In *Scales,* the court agreed that the defendant was under arrest and therefore in custody; it was dicta to speak of his physical condition also being a factor of confinement or custody. We now hold that the conditions of custody or otherwise deprivation of freedom requiring *Miranda* warnings to be those caused or created by the authorities.

*Roberts v. United States,* 445 U.S. 552, 560 (1980), stated: "Although *Miranda's* requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." This is consistent with the rationale of principles for the rule of

of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*Miranda* directed to "inherently coercive custodial inter-rogations" created or caused by the authorities.

The critical factor in *Orozco v. Texas,* 394 U.S. 324 (1969), was that the defendant was arrested in his own bedroom and questioned there by the police. The govern-ment argued *Miranda* applied only to persons in custody at a police station. The court disagreed and stated that *Miranda* applied to police station custody or to a person "otherwise deprived of his freedom of action in any sig-nificant way" and that arrest and questioning in his own bedroom came within the latter application of the rule. The arrest of the defendant prior to questioning even in familiar surroundings was controlling and the *Orozco* facts were an example of what the court meant by being deprived of freedom of action in any significant way other than police station custody.

Ringel, William E., Searches & Seizures, Arrests and Confessions, Vol. 2, sec. 27.3 (a) (3) at 27–16, cites the majority view that questioning in hospitals is not cus-todial when the suspect is not under formal arrest. As that text also states, the focus theory of *Escobedo* has not been applied to *Miranda* warnings circumstances. For *Miranda* warnings, it is an issue of custody and outside of police station locations arrest does become a critical factor. *See* Ringel, sec. 27.3, at 27–5—27–10.

In the case under consideration, the defendant at the time of questioning was not under arrest; the officers asked consent of the doctors to question him. There were up to seven medical persons present; there was no evi-dence of trickery or pressure applied to the defendant. The defendant was completely conscious and gave de-tailed information about his deceased passengers. The lack of control of the police over the circumstances of the interrogation was evidenced by the fact that when the defendant was placed under arrest, the police instructed a nurse to obtain a blood specimen from the defendant

and she would not do it until she had permission of the doctor.

The circumstances of the emergency ward where the defendant was located when questioned did not require the *Miranda* warnings. He was not under arrest and it was not "custodial interrogation," since he was not deprived of his freedom by the authorities in any significant way. As the Supreme Court said in *United States v. Washington*, 431 U.S. 181 (1977) : "All *Miranda's* safeguards, which are designed to avoid the coercive atmosphere, rest on the overbearing compulsion which the Court thought was caused by isolation of a suspect in police custody." *Id.* at 187, n. 5.

Clappes was not questioned in a coercive atmosphere of isolation created by the police giving rise to overbearing compulsion. The circumstances were public with witnesses present and no apparent police trickery or deception was used. The questions asked related to police investigation of a double fatal accident identifying the parties and circumstances, not a custodial verbal search intending to lead to the defendant's self-incrimination. Police station interrogation carries a strong presumption of custody, although even that can be voluntary on the defendant's part (*see Roberts v. United States*, 445 U.S. 552) ; however, that strong custodial presumption does not exist in a public place, with others present as witnesses, without an arrest having been made.

We hold the circumstances of this case did not involve custodial interrogation of the defendant and did not require the *Miranda* warnings before the officers asked the defendant the questions.

Still not answered in this case is whether the answers to the questions asked by the officers were voluntary. As we stated in *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 262, 133 N.W.2d 753 (1965), we adopted the orthodox rule for testing voluntariness of a confession and in

this case Clappes' admission of being the driver was a confession. We said:

"In essence the orthodox rule provides for a separate hearing before the trial judge alone on the issue of voluntariness with a determination by him that is final. If the trial judge finds on a proper record that the confession is involuntary, that is the end of the matter and the jury never considers the confession. If the judge determines that the confession was voluntarily made, the confession is admitted and the jury consideration is limited to its weight and credibility. In essence this rule is but an extension of the present procedure for establishing the admissibility of evidence challenged by a motion to suppress."

We defined in *Scales* the distinction between a *Miranda* hearing as to the constitutionally antiseptic quality of a confession and a *Goodchild* hearing as to voluntariness. 64 Wis. 2d at 489, 490. We find the answers obtained from Clappes did not require preceding *Miranda* warnings, but there is still necessity for a *Goodchild* hearing as to voluntariness, if the defendant challenges the use of his admissions on that basis.

*By the Court.*—The decision of the court of appeals is reversed.

WILLIAM A. BABLITCH, J. (dissenting). I dissent. I agree with the trial court and the court of appeals that this case is governed by *Scales v. State,* 64 Wis. 2d 485, 219 N.W.2d 286 (1974), and that this case cannot be distinguished from *Scales.* The majority opinion holds that absent arrest or the curtailment of an individual's freedom created by the police, the police, in questioning that individual, have no duty to advise him of his constitutional rights regardless of the motivation of the police, their belief in that individual's guilt, or the evidence in their possession. That result is contrary to this court's decision in *Scales.* That result is also contrary to the

language and intent of *Miranda v. Arizona,* 384 U.S. 436 (1966).

The majority correctly states that *Miranda* held "statements of the defendant obtained from questions asked while in *custody or otherwise deprived of his freedom of action in any significant way* could not be used as evidence against him, unless preceded by the *Miranda* warnings." *Supra* at 282. (Emphasis in original.) However, the majority's conclusion that this deprivation of freedom must be caused or created by the police ignores the clear language of *Miranda.* In *Miranda,* the Court stated: "[T]oday, then, there can be no doubt that the fifth amendment privilege is available outside of criminal court proceedings and serves to protect persons *in all settings in which their freedom of action is curtailed in any significant way* from being compelled to incriminate themselves." 384 U.S. at 467. (Emphasis supplied.) The concern in *Miranda,* therefore, was with the custodial atmosphere in which the police questioned an individual, and the psychological effect of that atmosphere on the individual, not with who caused or created a curtailment of freedom. The court stated, "we concern ourselves primarily with this interrogation atmosphere and the evils it can bring." *Id.* at 456. The court also stated ". . . we *stress that* the modern practice of *in-custody interrogation is psychologically* rather than physically *oriented," Id.* at 448 (emphasis supplied), and that warning an individual of his rights "is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere." *Id.* at 468.

In this case, Douglas Clappes was being treated for injuries in a hospital emergency room. His mental and physical condition, so soon after an injury, would, under Wisconsin law, be enough to preclude the use of any statements he made in a defense against a civil suit arising out of those injuries. *See* sec. 904.12, Stats. That

provision, which prohibits the admission into evidence of statements of injured parties made within 72 hours of the injury, is based on the policy that admission of such evidence would be ". . . unfair because the physical and mental condition of the injured person might prevent him from properly safeguarding his rights." *Schueler v. Madison,* 49 Wis. 2d 695, 708, 183 N.W.2d 116 (1971). This policy suggests that Clappes may have been in a condition in which he was susceptible to suggestion and thus more prone to incriminate himself.

The majority holds that officers need affirmatively initiate the custodial situation with an arrest; their presence and questioning of a suspect whose freedom is restricted for other reasons is not, alone, enough to create "custodial interrogation." To require an arrest, however, is to elevate form over substance. As the Supreme Court said in *Miranda,* it is the psychological effect on the defendant, created by being ". . . taken into custody *or* otherwise [being] deprived of his freedom of action in any significant way" that is significant. 384 U.S. at 444.

In this case, the officers, while questioning Clappes, stood on either side of his head. They filled his view of the world to the same extent that an interrogation room would to an uninjured defendant. One officer, using a loud voice, asked Clappes, ". . . *you were driving;* is that right?" The question was asked again in a loud voice. The accusatorial tone and physical position of the officers created the psychological element of interrogation that the Supreme Court was so concerned about in *Miranda;* namely, the *perception* of the defendant that he is cut off from all support. The officers in this case affirmatively contributed to the creation of a custodial atmosphere, to the deprivation of Clappes' freedom of action; Clappes therefore had a right to be informed of his constitutional rights.

The majority opinion is also contrary to the statements of this court in *Scales*. In *Scales*, this court stated: The emphasis of *Miranda* . . . is upon the necessity of extending constitutional rights to persons in the presence of overwhelming police power and who are cut off from contact, for the time being at least, from family, friends, and counsel." *Id.* at 491–92. The majority opinion in this case notes the presence of physicians and nurses at the time the defendant was being questioned and the control that these medical personnel had over the defendant. However, this does not change the fact that the defendant was deprived of his freedom, was subjected to police interrogation, and was cut off from family, friends and counsel during the interrogation. Further, the questioning of the police was accusatorial and instilled in the defendant the impression that the police were merely confirming information already in their possession. (*See supra* at 280.) As this court stated in *Scales:* "Police officers cannot take advantage of a coercive situation which limits an accused's freedom of action and then proceed to interrogate him without proper admonitions." *Id.* at 492.

The majority seeks to distinguish *Scales* on the basis that the defendant in that case had already been placed under arrest at the time of questioning. However, the defendant Scales was not aware that an arrest had been made. Scales, like Clappes, was severely injured and immobilized on a hospital bed when questioned. The controlling factor in *Scales*, and in the present case, was not that an arrest had been made, but that a custodial atmosphere and coercive situation were created by police presence. Admissions obtained under such circumstances in the absence of *Miranda* warnings constitute a violation of the fifth amendment privilege against self-incrimination.

Courts in other jurisdictions have squarely addressed the issue now before this court, and have concluded that *Miranda* warnings were required under circumstances analogous to those present in this case.[1] In *Shedrick v. State,* 10 Md. App. 579, 271 A.2d 773 (1970), officers took a statement at a hospital from a defendant who had been treated for injuries at the hospital, without fully advising the defendant of his constitutional rights. The court held that the statement was a product of "custodial interrogation" within the meaning of *Miranda,* and that full *Miranda* warnings were therefore required. Similarly, in *Howard v. State,* 217 So. 2d 548 (Ala. 1969), the defendant was questioned in a hospital following an automobile accident. The court stated that being in the hospital was the equivalent of detention and that "we would be naive if we believed that Howard could have freely walked away. . . ." 217 So. 2d at 549.

The critical factor in determining whether police had a duty to advise an individual of his constitutional rights is not whether it was the police who caused or created the deprivation of freedom. Rather, when an individual's freedom of action has been deprived in any significant way, and when the presence of the authorities creates a custodial atmosphere where the individual is cut off from the psychological support of friends, family or counsel, the authorities must advise the individual of his constitutional rights before questioning him. The *Scales* rule requiring that a person in the situation presented in *Scales* and in this case be apprised of his or her *Miranda* rights is sound as a matter of public policy

---

[1] Cases that have found police questioning of a defendant in a hospital prior to arrest to require *Miranda* warnings include: *State v. Ross,* 183 Neb. 1, 157 N.W.2d 860 (1968); *Howard v. State,* 44 Ala. App. 595, 217 So. 2d 548 (1969); *Shedrick v. State,* 10 Md. App. 579, 271 A.2d 773 (1970); *Commonwealth v. D'Nicuola,* 448 Pa. 54, 292 A.2d 333 (1972).

and is a necessary requirement for the administration of the criminal justice system. I therefore dissent.

I am authorized to state that JUSTICE SHIRLEY S. ABRAHAMSON joins in this dissent.