UNITED STATES of America,
Plaintiff-Appellee,

v.

BOON  SAN  CHONG,
Defendant-Appellant.

No. 85–5544.

United States Court of Appeals,
Eleventh Circuit.

Oct. 26, 1987.

Paul A. McKenna, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Eileen O'Connor, AUSA Miami, Fla., Linda Collins Hertz, David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before ANDERSON, Circuit Judge, and GODBOLD * and SWYGERT,** Senior Circuit Judges.

SWYGERT, Senior Circuit Judge:

In this criminal appeal, the defendant-appellant, Boon San Chong, alleges that the district court committed a number of errors during his trial for extortion. We affirm.

I

In September 1983, Chong and two co-defendants flew from New York City to Florida to obtain money from Winston Lee, the owner of a Chinese restaurant in Fort Lauderdale. On September 6, they drove to Lee's home. When Lee and his wife arrived at around midnight, Chong and his co-defendants met the Lees in the driveway and forced them at gunpoint into the house. Unable to find a substantial amount of cash inside the house, the three men kept guard over the Lees throughout the night. The next morning, one of Chong's co-defendants, Lee Pung Chung, accompanied Lee's daughter to the bank, where the daughter eventually cashed a check for $4,000. After obtaining the $4,000, the three men demanded an additional $60,000 and threatened to take Lee's granddaughter with them as security until the additional amount was paid. After some discussion with Lee, they agreed to leave the granddaughter alone if Lee would make weekly payments beginning the following week. When Chong and Chung returned to Florida on September 13 to collect the next payment, they were arrested by FBI agents.

Following his arrest, Chong was advised of his *Miranda* rights in English. He was also provided with an Advice of Rights form printed in Chinese, the top portion of which set forth the rights and the bottom portion of which contained a waiver. Although after reading the form Chong stated that he understood his rights, he refused to sign the waiver portion of the form. An FBI agent then began questioning Chong, although communication was difficult because Chong spoke little English. When questioned in simple English about the Lee incident, Chong admitted that he had demanded money from the Lees on September 6 and had returned to collect an additional payment. He refused to respond to questioning concerning other crimes, however. At no time did he request an attorney.

Chong was subsequently charged with conspiracy to extort money, in violation of 18 U.S.C. §§ 1951 and 1952; extortion, in violation of 18 U.S.C. §§ 1951 and 1952; and using firearms to commit a felony, in violation of 18 U.S.C. § 924(c)(1), (2). Prior to trial, Chong filed a motion to suppress his post-arrest statements, which the district court denied. Chong's defense at trial was that he had been coerced by Chinese gang members in New York's Chinatown to participate in the extortions. His position was that the gang members had sent him to Florida to collect gambling debts that the Lees owed the gang. Defense counsel sought to cross-examine Lee regarding his contact with the gang members and the existence of these gambling debts,

---

* See Rule 34–2(b), Rules of the United States Court of Appeals, for the Eleventh Circuit.

** Honorable Luther M. Swygert, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

but the trial court sustained the government's objection on grounds of relevancy.

With respect to Chong's coercion defense, there was evidence that both Chong and Chung, who testified as a government witness pursuant to a plea agreement, had been threatened by members of the New York gang. However, Chong admitted on cross-examination, over defense counsel's objection, that he had participated in another similar home invasion. The prosecution referred to this prior incident during closing argument, again over defense counsel's objection. A jury found Chong guilty on all counts, and Chong was sentenced to an aggregate term of thirty years in prison.

On appeal, Chong argues that (1) his post-arrest statements were taken in violation of his fifth amendment rights and should not have been admitted at trial; (2) the district court denied him his sixth amendment right of confrontation by restricting defense counsel's cross-examination of Lee; (3) the district court erred in allowing evidence of the prior home invasion; and (4) the prosecutor's remarks during closing argument concerning the prior home invasion violated his right to a fair trial.

## II

*Post-Arrest Statements*

There is no question that before the FBI interrogation began, Chong was informed of his *Miranda* rights in both English and Chinese. He also indicated that he understood his rights. Thus, the only issue is whether Chong voluntarily, knowingly, and intelligently waived those rights. Chong maintains that his refusal to sign the waiver form indicated that he was choosing to exercise his rights rather than waive them. He argues that in light of his difficulties with English, no further questioning should have occurred until agents were able to secure an express waiver in Chinese through an interpreter.

Courts have for some time rejected the argument that a refusal to sign a waiver form automatically renders subsequent questioning improper. "A refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody." *United States v. McDaniel*, 463 F.2d 129, 135 (5th Cir. 1972), *cert. denied*, 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973); *see also United States v. Eirin*, 778 F.2d 722, 728 (11th Cir.1985); *Palmes v. Wainwright*, 725 F.2d 1511, 1516–17 (11th Cir.), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *United States v. McKinney*, 758 F.2d 1036, 1045 (5th Cir. 1985). In the absence of an express waiver, a waiver of rights can be implied from the actions and words of the person being questioned. For example, if after being advised of his rights an individual responds willingly to questions without requesting an attorney, waiver may be implied. *Eirin*, 778 F.2d at 727–28. An accused's decision to answer some questions, but not others, further supports a finding of an implied waiver—the accused's selective responses suggest an understanding of the right not to respond. *Id.* at 728. Because Chong never requested an attorney and because he chose to answer some questions but not others shortly after reading the Chinese Advice of Rights form, we conclude that his refusal to sign the waiver form did not render subsequent questioning improper.

The argument that Chong's difficulty with English required the FBI agents to secure an express waiver in Chinese before questioning him also is not a persuasive one. Although language barriers may in some instances impair an individual's ability to waive his rights in a knowing manner, *see United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir.), *cert. denied*, 474 U.S. 836, 106 S.Ct. 110, 88 L.Ed.2d 90 (1985), Chong was advised of his rights in both his native language and English and claimed to understand those rights. His election to answer questions shortly after reading the Chinese Advice of Rights form indicates that he was knowingly waiving his rights, despite the language problems.

*Cf. Perri v. Director, Dept. of Corrections,* 817 F.2d 448, 452–53 (7th Cir.1987) (where defendant was given his rights in Italian and stated in English that he understood those rights, waiver was knowing and intelligent); *United States v. Gonzales,* 749 F.2d 1329, 1336 (9th Cir.1984) ("Even if [the police officer] spoke very poor Spanish and appellant spoke very poor English, the written Spanish would have conveyed to appellant a sufficient understanding of his rights."). Under these circumstances, we conclude that the record supports the district court's determination that Chong voluntarily, knowingly, and intelligently waived his *Miranda* rights. The motion to suppress therefore was properly denied.

### III

*Cross-Examination of Lee*

■ Chong next claims that the district court improperly limited the scope of his cross-examination of Lee, a government witness. Chong sought to establish that Lee had been targeted for extortion because Lee owed gambling debts to the gang into which Chong had been forcibly recruited. Lee suggested on direct examination that he had been selected as the victim because he was wealthy, and on cross-examination he denied that he had any experience with Chinese gangs or that he had borrowed money for gambling from people in New York City. Further questioning by defense counsel regarding the existence of these gambling debts was prohibited as irrelevant. Chong claims that this factual matter went directly to Lee's trustworthiness and credibility as a witness and that by limiting further cross-examina-

tion the district court deprived Chong of his sixth amendment right to confront adverse witnesses.

While it is true that the sixth amendment guarantees a defendant the right to expose the jury to facts bearing on the trustworthiness and reliability of an adverse witness, *see Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974), the information sought to be elicited must be relevant. *United States v. Kopituk,* 690 F.2d 1289, 1337 (11th Cir.1982), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). In this case, establishing that Lee had borrowed money from the Chinatown gang would not have tended to prove Chong's claim that the gang forced him to extort money from Lee—the reason for selecting Lee was irrelevant to the issue of Chong's willingness to commit the crime. Because proving the existence of gambling debts would have failed to impeach Lee on anything but a collateral matter, we conclude that Chong was not denied his sixth amendment right of confrontation.

### IV

*Previous Home Invasion Experience*

During its cross-examination of Chong, the government elicited testimony concerning Chong's participation in another similar home invasion in July 1983, an act for which he had been charged but not convicted.[1] In the prior incident, Chong invaded the home of the Au family, also Chinese restaurant owners residing in Florida, and demanded money while armed.[2] Chong asserts that this evidence should have been excluded under Fed.R.Evid. 608(b),[3] since

---

1. The government also attempted to introduce the prior incident into evidence through the testimony of Lee Pung Chung, the cooperating co-conspirator. Chung testified on cross-examination that on September 6 Chong entered the Lee house before he did because Chong was "more experienced." The government sought to explore this statement further on redirect examination, but was not permitted to do so.

2. The government attempted to question Chong about a previous home invasion that took place in Maryland as well, but the court sustained defense counsel's objection and instructed the

jury to disregard the question regarding the Maryland incident.

3. Fed.R.Evid. 608(b) provides in pertinent part: Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning his character for truthfulness or untruthfulness....

the prior misconduct did not relate to Chong's character for truthfulness. Regardless of the admissibility of the evidence under rule 608(b), however, the Au incident was admissible under rule 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ This court has stated that extrinsic acts are admissible under rule 404(b) so long as (1) the extrinsic offense is relevant to an issue other than the defendant's character; and (2) the probative value of the evidence is not substantially outweighed by its prejudicial effect. *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *United States v. Hicks,* 798 F.2d 446, 451 (11th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 886, 93 L.Ed.2d 839 (1987). When the prior act is similar to the charged offense and is proximate in time to the charged offense, as is the case with the Au incident, the extrinsic act is relevant and highly probative on the issue of the defendant's state of mind. *See Eirin,* 778 F.2d at 731–32 (prior money laundering schemes admissible to show intent in committing a similar money laundering scheme); *United States v. Hewes,* 729 F.2d 1302, 1314–15 (11th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985) (prior "bustout" and franchising schemes admissible to show that the bustout schemes alleged in the indictment were not merely business failures resulting from a string of bad luck); *United States v. Holman,* 680 F.2d 1340, 1348–49 (11th Cir.1982) (evidence of prior smuggling activities admissible to refute defendant's claim that he participated in marijuana smuggling solely because of threats on his son's life). Because the prior home invasion tended to undermine Chong's assertion that his participation in the Lee extortions was the product of duress, the first portion of the *Beechum* test is satisfied.

■ The second portion of the *Beechum* test, the determination of whether the probative value of the evidence is substantially outweighed by its prejudicial effect, lies within the sound discretion of the trial judge. *Eirin,* 778 F.2d at 732. The trial court mitigated any prejudicial effect the evidence may have had by giving the jury a cautionary instruction on the limited use of the extrinsic act evidence.[4] In addition, the court allowed the government to present the evidence only after Chong took the stand and testified that he had acted under duress. Under these circumstances, we conclude that the court did not abuse its discretion in allowing the government to elicit testimony concerning the prior home invasion.

■ Finally, Chong contends that the government's reference to the Au incident during closing argument[5] deprived him of a fair trial because evidence of the prior act was not properly before the jury.[6] In light of our conclusion that the Au incident was admissible under Fed.R.Evid. 404(b), we must reject this argument.

For the foregoing reasons, Chong's conviction is AFFIRMED.

---

4. Record, Vol. 5, at 506, 511–13.

5. At the end of the rebuttal closing, the prosecutor stated:
   > He's not "little Boon San Chong," he's big, and he's a big criminal and he's done a lot of crimes.... Been in the Au house, Lee House. He's come back to do more.

   Record, Vol. 6, at 678.

6. Chong also relies on *United States v. Bell,* 535 F.2d 886, 887–88 (5th Cir.1976), in which the court held that evidence of the defendant's prior crimes admitted solely for impeachment purposes during cross-examination may not properly be referred to in closing argument. *Bell* is inapposite, however, because the Au incident was admissible under rule 404(b), although it also impeached Chong's credibility to the extent that it undermined his claim that he had been forced to extort money from the Lees.